**COLORADO INTERSTATE GAS
COMPANY and ANR Pipeline
Company, Petitioners,**

v.

**FEDERAL ENERGY REGULATORY
COMMISSION, Respondent,**

UGI Utilities, Inc., et al., Intervenors.

Nos. 97–1214 and 97–1215.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 11, 1998.

Decided June 23, 1998.

Richard W. Miller argued the cause for petitioners. With him on the briefs was Daniel F. Collins.

Edward S. Geldermann, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. With him on the brief was Jay L. Witkin, Solicitor, and Susan J. Court, Special Counsel.

Before: WALD, WILLIAMS and TATEL, Circuit Judges.

STEPHEN F. WILLIAMS, Circuit Judge:

■ Under the regulatory regime now applicable to interstate pipelines, not only pipelines but other actors in the gas industry (such as independent marketers) may hold entitlements to pipeline capacity. Non-pipeline actors are free to acquire additional capacity entitlements without advance approval by the Federal Energy Regulatory Commission. But in the decisions under review here, the Commission ruled that an interstate pipeline seeking to acquire capacity rights on another pipeline ("offsystem capacity") could do so only with the advance approval of the Commission. Because the Commission failed to offer a reasoned explanation for this difference in treatment, we remand the case for further proceedings.

\*     \*     \*

■ Historically, natural gas pipelines bought natural gas at the wellhead and carried it to various markets for resale. As part of its effort to shift to "light-handed regulation" of the gas industry under the Natural Gas Act, the Commission in its Order No. 636 required interstate pipelines to "unbundle" their sales role from their transportation role. The Commission's purpose was to ensure that pipelines' natural monopoly over the transportation grid did not give them an unfair advantage over non-pipeline sellers of gas. See generally *United Distribution Companies v. FERC*, 88 F.3d 1105, 1125–27 (D.C.Cir.1996) (describing Order No. 636). To facilitate the unbundling process, Order No. 636 required pipelines to assign the capacity rights they held on upstream pipelines

(i.e., on pipelines closer to the point of production) to their existing firm transportation customers, except for a limited amount of capacity needed for operational purposes such as keeping line pack in balance.[1] See Order No. 636–A, FERC Stats. & Regs. ¶ 30,950, at 30,566–67 (Aug. 3, 1992). FERC reasoned that if pipelines were allowed to retain upstream capacity on other pipelines, they could inhibit the development of a competitive sales market by favoring their sales function or otherwise making it more difficult for downstream customers to buy from producers at competitive prices. See *UDC*, 88 F.3d at 1136.

Texas Eastern Transmission Company asked FERC for a declaration that Order No. 636 did not establish a *per se* rule prohibiting interstate pipelines from holding capacity on other pipelines. On January 31, 1996 the Commission issued an order agreeing with Texas Eastern. *Texas Eastern Transmission Corp.*, 74 FERC ¶ 61,074, at 61,220 (1996) ("January Order"). It observed that Order No. 636's rationale for requiring pipelines to assign upstream capacity had lost much of its force, since most pipelines had already implemented the unbundling requirement. *Id.* "The transition to unbundled sales is now complete," the Commission found, "and pipelines and their shippers have become more accustomed to doing business in the unbundled environment." *Id.* Further, FERC recognized that "pipelines and their shippers face a dynamic and rapidly changing market," in which "acquisition of new upstream or downstream capacity may offer a mechanism for interstate pipelines to provide shippers with access to new supply and market areas." *Id.* A *per se* ban on acquisition of offsystem capacity would force pipelines interested in serving new markets to physically expand their own capacity, a decision that "could result in duplicative and unnecessary facilities contrary to the Commission's goal of meeting new demand with both the least cost and least environmental impact." *Id.* Allowing pipelines to acquire offsystem ca-

---

1. Line pack is defined as the quantity of natural gas that is necessary to fill the pipeline itself, so as to maintain the necessary operating pressures.

*Kern River Gas Transmission Company,* 50 FERC ¶ 61,069, at 61,156 (1990).

pacity could also produce benefits for the acquiring pipeline's shippers, the Commission concluded, allowing them to deal with a single pipeline and thus "avoid the administrative burdens of contracting, billing, scheduling, nominating, balancing, and dealing with penalties on multiple pipelines." *Id.*

Nonetheless, the Commission said that any pipeline intending to acquire upstream or downstream capacity must secure advance Commission approval of the proposed service. *Id.* at 61,221. The Commission justified this requirement by reference to a variety of concerns. There appeared to be four basic ones. First, the acquiring pipeline might control customer choices or tie use of the acquired capacity to other pipeline or pipeline affiliate services. Second, depending on the treatment of the costs, rate changes might result that had adverse impacts on customers of the acquiring pipelines, on firms competing with the acquiring pipeline's marketing affiliate, or on customer choices among supply basins. Third, there might be preferential treatment of the acquiring pipeline over the customers of the selling pipeline (presumably by the selling pipeline, but the Commission does not identify the actor). Fourth, some adverse effects might flow from the way the capacity would be managed or otherwise integrated into the existing open access operations of the acquiring pipeline. Here the Commission expressed particular concern about access to receipt and delivery points on the acquired capacity. *Id.* at 61,220–21.

Two interstate pipelines, Colorado Interstate Gas Company and ANR Pipeline Company, petitioned for rehearing. They contended that the Commission's case-by-case authorization requirement discriminated against pipelines, since the Commission permits non-pipeline shippers to acquire capacity and ship gas on any pipeline without prior approval. They pointed to existing regulatory safeguards by which the Commission can guard against the concerns that purportedly justify the prior authorization requirement, arguing that these safeguards already place greater controls on pipelines than on non-pipeline shippers. The delay and uncertainty engendered by the pre-approval require-

ment, they said, would inflict a competitive disadvantage on the pipelines, hobbling their efforts to make prompt commitments to firm deals.

In the second order under review the Commission denied the rehearing petition, repeating many of the arguments on which it relied in its initial order. *Texas Eastern Transmission Corp.*, 78 FERC ¶ 61,277, at 62,161–62 (1997) ("Rehearing Order"). In addition, it reasoned that because a pipeline's acquisition of offsystem capacity was an alternative to construction of duplicate facilities, Commission review was appropriate for the reasons justifying advance review of such construction. *Id.* at 62,161. CIG and ANR petitioned for review in this court.

\* \* \*

The Commission does not seriously contest that the delay associated with case-by-case authorization practically eliminates any opportunity for pipelines to compete in the increasingly important market for short-term transportation services. Even for long-term transactions, the requirement hinders pipelines' efforts to make prompt and reliable commitments. And it generally hampers their ability to participate in the Commission's "capacity release" program, under which shippers who hold firm transportation capacity can release it to others when it is unneeded. See 18 C.F.R. § 284.243.

The Commission's justification of the prior authorization requirement presents two difficulties. First, in pointing to the various possible hazards of pipeline acquisitions of offsystem capacity, the Commission never explains why these concerns are more severe when the acquisitions are made by a pipeline than by a non-pipeline—so much more severe that advance application and approval are needed only for the former. For example, the Commission said that a pipeline acquiring offsystem capacity might manipulate customer choices, perhaps by conditioning access to the acquired capacity on the customer's use of the pipeline's services or those of its affiliates. The scale of this risk would seem to turn on the extent to which, for any origin-and-destination pair, the acquired link afforded its holder market power. The risk may be substantial, but the Commission has not

explained—and nothing in the record indicates—why it is more severe when pipelines rather than gas marketers get hold of the capacity. Particularly in light of the Commission's own finding that the "transition to unbundled sales is now complete," January Order, 74 FERC at 61,220, it must give a fuller explanation of why these unbundled pipelines nonetheless continue to pose greater hazards to competition than do other holders of transportation capacity.

Second, the Commission fails to address the petitioners' argument that regulatory mechanisms already exist to control any hazards that might arise when a pipeline is the acquiring entity. This failure to address existing controls on pipeline behavior applies to all of the risks identified by the Commission. Its concern about the rate impact of capacity acquisition is especially puzzling, since a pipeline can only charge rates stated in a Commission-approved tariff. So far as rates for the service itself are concerned, we infer that the pipeline would have to charge according to some previously approved formula (including whatever flexibility is available under Commission rules, such as its authorization of discount rates, see 18 C.F.R. § 284.7(c)(5)(ii)(A)). As for possible rate effects on customers not using the acquired capacity, any attempt to shift the costs of the acquired capacity apparently has to run the gauntlet of a rate change filing under § 4 of the Act, which would enable the Commission to protect any otherwise adversely affected customers. The Commission seemed to recognize this fact in its Rehearing Order, only to brush it aside without discussion:

> Conceivably, these types of [anticompetitive] issues, to the extent they implicate subsidization or improper allocation of costs, could be addressed when the pipeline filed a rate case to recover the costs of offsystem capacity. Still, we believe the public interest is best served if proposals by pipelines to acquire capacity, like proposals to construct it, are reviewed beforehand.

Rehearing Order, 78 FERC at 62,162.

At oral argument Commission counsel seemed to suggest that it might be difficult for the Commission to say no in a § 4 proceeding once the pipeline had incurred the costs of acquisition. Why the Commission would be so tender-hearted to the pipeline is unclear. In any event, rather than singling out pipelines for the competitive disadvantage of preclearance, the Commission could establish a general rule that pipelines must bear the risk of loss from capacity acquisitions. Cf. *Associated Gas Distributors v. FERC*, 824 F.2d 981, 1033–38 (1987) (upholding "optional expedited certification" process establishing rebuttable presumption of Section 7 approval for pipelines willing to assume full economic risk of new ventures).

Even apart from rate matters, existing regulations appear to guard more thoroughly against the risks of anticompetitive behavior by pipeline holders of offsystem capacity than against similar risks posed by non-pipeline holders of capacity. Interstate pipelines are governed by the terms of their blanket certificates of public convenience and necessity, granted under § 7 of the Natural Gas Act. See 18 C.F.R. § 284.221. These require the pipeline to make its transportation service available on a nondiscriminatory basis under open access tariffs determined by the Commission. 18 C.F.R. § 284.8. By contrast, non-pipeline shippers are not limited by the non-discrimination and open access requirements of the blanket certificate regulations.

Thus, if the Commission is concerned that a pipeline selling capacity might favor an acquiring pipeline over its other customers, it can address the issue by enforcing the selling pipeline's obligation to comply with the blanket certificate regulations and its open access tariff. Likewise, if it is concerned about whether the acquired capacity will be managed or integrated into existing open access operations in a manner harmful to shippers, it can enforce the open access tariff of the acquiring pipeline.

Perhaps the Commission reasonably fears that, even taking these safeguards into account, pipeline acquisitions of offsystem capacity pose such grave threats that without preclearance it will be unable to perform its protective mission. If so, the Commission must explain the basis of that fear. Alternatively, given the pipelines' wish to participate

flexibly and responsively in the market, especially in the emerging spot markets, the Commission may explain itself on remand by identifying ways the pipelines can satisfy the pre-approval requirement and still achieve that goal.

■ We can find no merit in the Commission's theory that, because pipeline arrangements for acquiring existing capacity on other systems are substitutes for new construction, such acquisitions similarly require advance review. Mere transfers of existing capacity rights do not raise the issues that justify FERC review of construction certificate applications—avoiding duplication of facilities, environmental disturbance, and waste of resources.

■ We reject, however, CIG and ANR's claim that 18 C.F.R. § 284.223(a) independently confers on pipelines a right to acquire offsystem capacity without prior Commission approval. That regulation provides that "any interstate pipeline issued [a blanket certificate] ... is authorized, without prior notice to or approval by the Commission, to transport natural gas for any duration for any shipper for any end-use by that shipper or any other person." CIG and ANR read this language in conjunction with the January Order's observation that once a downstream pipeline has acquired capacity on an upstream pipeline it "will be the shipper on the upstream pipeline." January Order, 74 FERC at 61,220. From this, as we understand it, they infer that the downstream pipeline is a "shipper" for purposes of § 284.223(a), so that when a pipeline moves gas on capacity acquired from an upstream pipeline, the latter is in effect exercising its authority under the regulation "to transport natural gas ... for any shipper," here the downstream pipeline.

The Commission's answer, in effect, is that there are shippers and shippers. In § 284.223(a) the term "shipper," read against the backdrop of FERC's Order 636–A, refers only to an entity that holds title to gas while it is being transported. And the January Order, in the same passage cited by CIG and ANR, specifically noted that downstream pipelines holding capacity on upstream pipelines would occupy a "limited exception" to this dominant understanding of the term "shipper," since they would "*not* hold title when the gas is being shipped." January Order, 74 FERC at 61,221 (emphasis added).

■ We of course "afford substantial deference to the Commission's interpretations of its own regulations, deferring to the agency unless its interpretation is plainly erroneous or inconsistent with the regulations." *Northern Border Pipeline Co. v. FERC,* 129 F.3d 1315, 1318 (D.C.Cir.1997) (citation and internal quotation marks omitted). Here the reasonableness of the Commission's interpretation of § 284.223(a) seems no different from that of its overall differential treatment of pipelines and non-pipelines with respect to pre-approval. Put another way, on FERC's view a downstream pipeline only becomes a "shipper" (in a limited, non-titleholding sense) once it has satisfied the Commission through the prior authorization process that acquisition of upstream capacity is permissible. Assuming that the Commission on remand can provide adequate reasons for its decision to impose this process on pipelines alone, those reasons should also suffice to deny pipelines, alone among "shippers," the benefits of § 284.223(a).

■ In summary, although FERC enjoys broad discretion in establishing procedures to cope with issues presented by deregulation, see *Mobil Oil Exploration & Producing Southeast, Inc. v. United Distribution Companies,* 498 U.S. 211, 230, 111 S.Ct. 615, 112 L.Ed.2d 636 (1991), it must state reasoned justifications for the procedures it establishes. Because it has not adequately explained its decision to treat pipelines and non-pipelines differently in a context where they appear similarly situated, we remand the case to the Commission for a fuller explanation.

*So ordered.*