# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

Argued March 6, 2014          Decided August 26, 2014

No. 12-1340

WEST DEPTFORD ENERGY, LLC,
PETITIONER

v.

FEDERAL ENERGY REGULATORY COMMISSION,
RESPONDENT

FPL ENERGY MARCUS HOOK, L.P. AND PJM
INTERCONNECTION, L.L.C.,
INTERVENORS

On Petition for Review of Orders of the
Federal Energy Regulatory Commission

*Ashley C. Parrish* argued the cause for petitioner. With him on the briefs were *Karen F. Grohman*, *Neil L. Levy*, and *Stephanie S. Lim*.

*Holly E. Cafer*, Attorney, Federal Energy Regulatory Commission, argued the cause for respondent. On the brief were *David L. Morenoff*, Acting General Counsel, *Robert H. Solomon*, Solicitor, and *Beth G. Pacella*, Senior Attorney.

*Paul M. Flynn* argued the cause for intervenors. With him on the brief were *Barry S. Spector*, *Jennifer H. Tribulski*, and *Stephen L. Huntoon*.

Before: GARLAND, *Chief Judge*, and SRINIVASAN and MILLETT, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* MILLETT.

MILLETT, *Circuit Judge*: The Federal Power Act requires regulated utilities to file with the Federal Energy Regulatory Commission, as a matter of open and accessible public record, any rates and charges they intend to impose for sales of electrical energy that are subject to the Commission's jurisdiction. *See* 16 U.S.C. § 824d(c). As a consequence, utilities are forbidden to charge any rate other than the one on file with the Commission, a prohibition that has become known as the "filed rate doctrine." *See NSTAR Elec. & Gas Corp. v. FERC*, 481 F.3d 794, 800 (D.C. Cir. 2007); *see also Arkansas La. Gas Co. v. Hall,* 453 U.S. 571, 577 (1981) (describing filed rate doctrine under the Natural Gas Act). That requirement of transparent, public filing of rates ensures evenhandedness, fairness, stability, and predictability in the prices charged for electrical energy.

The question in this case is, when a utility filed more than one rate with the Commission during the time it was negotiating an agreement with a prospective customer, which of the two filed rates governs: the rate at the time negotiations commenced or the rate at the time the agreement was completed? West Deptford argues that, as a matter of practice, the Commission has used the rate on file at the time the agreement was finalized. The Commission is of the view that it can pick and choose which rate applies on a case-by-case basis. *See PJM Interconnection, L.L.C.*, 136 FERC

¶ 61,195 (2011) ("Order"); *PJM Interconnection, L.L.C.*, 139 FERC ¶ 61,184 (2012) ("Rehearing Order"). We vacate the Commission's orders in part and remand because the Commission has provided no reasoned explanation for how its decision comports with statutory direction, prior agency practice, or the purposes of the filed rate doctrine.

# I

## *STATUTORY AND REGULATORY FRAMEWORK*

The Federal Power Act, 16 U.S.C. §§ 791a *et seq.*, charges the Commission with regulating "the transmission of electric energy" and "the sale of electric energy at wholesale" in interstate commerce, *id.* § 824(b)(1). In exercising that authority, the Commission must ensure that "[a]ll rates and charges" for the "transmission or sale of electric energy subject to" its jurisdiction are "just and reasonable," and that no public utility's rates are unduly discriminatory or preferential. *Id.* § 824d(a) & (b); *see NRG Power Marketing, LLC v. Maine Public Utils. Comm'n*, 558 U.S. 165, 167 (2010).

To that end, the Act requires every public utility to "file with the Commission" and "keep open in convenient form and place for public inspection schedules showing all rates and charges for any transmission or sale subject to the jurisdiction of the Commission." 16 U.S.C. § 824d(c). That obligation applies whether the rates and charges are set "unilaterally by tariff" or agreed upon in individual contracts between sellers and buyers. *NRG Power Marketing*, 558 U.S. at 171. When a public utility seeks to change its filed rate, it must "fil[e] with the Commission * * * new schedules stating plainly the change or changes * * * and the time when the change or changes will go into effect." 16 U.S.C. § 824d(d).

The Federal Power Act's express mandate of openness, transparency, and consistency in rates prevents discrimination, promotes fair and equal access to the utilities' services, ensures the stability and predictability of rates, and reinforces the Commission's jurisdictional authority. *See Maislin Industries, U.S., Inc. v. Primary Steel, Inc.*, 497 U.S. 116, 130–131 (1990); *Consolidated Edison Co. of New York v. FERC*, 347 F.3d 964, 969 (D.C. Cir. 2003); *Consolidated Edison Co. of New York v. FERC*, 958 F.2d 429, 432 (D.C. Cir. 1992) (R.B. Ginsburg, J.).

To foster competition in the wholesale energy market, the Commission drastically overhauled the regulatory scheme for public utilities in 1996. As part of that effort, the Commission ordered regulated utilities to separate financially their wholesale power-generation and power-transmission services. *See* Order No. 888, FERC Stats. & Regs. ¶ 31,036 (1996); *see also New York v. FERC*, 535 U.S. 1, 11 (2002) (describing Order No. 888). Accordingly, public utilities must now file tariffs with the Commission establishing separate rates for wholesale power generation service, transmission service, and any ancillary service. *New York*, 535 U.S. at 11. In addition, they must "take transmission of [their] own wholesale sales and purchases under a single general tariff applicable equally to [themselves] and to others." *Id.*

Problems soon arose, however, because every time a new generator of electricity asked to use a transmission network owned by another—to interconnect the two entities—disputes between the generator and the owner of the transmission grid would arise, delaying completion of the interconnection process. *See* Order No. 2003, FERC Stats. & Regs. ¶ 31,146 P 11 (2003). The Commission waded into those disputes case by case, delaying entry into the market by new generators and

providing an unfair competitive advantage to utilities owning both transmission and generation facilities. *Id.* at PP 10–11.

To address those issues, the Commission, in 2003, issued Order No. 2003, FERC Stats. & Regs. ¶ 31,146 at PP 11–12. That order replaced the Commission's case-by-case approach with a standardized process. The Order requires all regulated utilities that "own, control, or operate" transmission facilities to include standardized interconnection procedures and a form interconnection agreement in their filed tariffs. *Id.* at P 2. By mandating that "standard set of procedures," the Commission "minimize[d] opportunities for undue discrimination and expedit[ed] the development of new generation, while protecting reliability and ensuring that rates are just and reasonable." *Id.* at P 11.

### *FACTUAL BACKGROUND*

**1.** PJM Interconnection, L.L.C., is a regional transmission organization, an independent entity that operates transmission facilities in thirteen states and the District of Columbia. *See FPL Energy Marcus Hook, L.P. v. FERC*, 430 F.3d 441, 442–443 (D.C. Cir. 2005). Under PJM's Open Access Transmission Tariff, the interconnection process begins when a generator of electricity submits an interconnection request to PJM. PJM Tariff § 36.1.01, J.A. 747–748. Each request is placed into a "first-come, first-served queue." *Marcus Hook*, 430 F.3d at 443; *see* PJM Tariff § 201, J.A. 752.

The submission of an interconnection request triggers an often lengthy review by the utility and holds the requestor's place in the interconnection queue until it concludes. During this process, PJM conducts "a series of studies to determine the impact of a generator interconnection request on the PJM transmission system," including "the need for upgrades or

additions to those transmission facilities," PJM Br. 6, and an estimate of the requestor's cost responsibility for any needed upgrades, *see Marcus Hook*, 430 F.3d at 443. Those studies do "not set a rate for interconnection service," however; they merely provide "a non-binding estimate of costs." *Dominion Res. Servs., Inc. v. PJM Interconnection, L.L.C*, 123 FERC ¶ 61,025 P 52 (2008). Customers are thus free to "terminate or withdraw their interconnection requests" at any time. *Marcus Hook*, 430 F.3d at 443. Once PJM finishes the studies, it provides the requestor with a proposed interconnection service agreement that "specifies the customer's actual cost responsibility," including the cost of any upgrades needed to PJM's transmission network to sustain the increased demand. *Id.*

While a new service request might be what prompts a network upgrade, the "integrated transmission grid is a cohesive network," *Entergy Servs., Inc.*, 96 FERC ¶ 61,311, 62,202 (2001), and thus completed upgrades, whether they increase network capacity or simply improve stability, generally "benefit all transmission customers." Order No. 2003, FERC Stats. & Regs. ¶ 31,146 at P 21. For that reason, those generators who have to pay for upgrades under the PJM Tariff receive "incremental auction revenue rights" that give the generator the right to revenue from future sales of transmission services associated with the new or upgraded facility. *See* PJM Tariff § 231.1, J.A. 764; *see also PJM Interconnection, L.L.C.*, 126 FERC ¶ 61,280 P 3 (2009) (describing the function of auction revenue rights). That auction revenue, in turn, partially compensates the generator for the financial burden it bore in improving the transmission network for all users. *See* Order No. 2003, FERC Stats. & Regs. ¶ 31,146 at P 694.

**2.** In 1998, three generators submitted interconnection requests to PJM for the following projects: the Mantua Creek Project, the Liberty Electric Project, and the Marcus Hook Project. Rehearing Order at P 3; *Marcus Hook*, 430 F.3d at 444. PJM determined that the projects' combined load would "push [its] system beyond the breaking point," and thus advised a $13 million upgrade ("Upgrade") to a transmission circuit. *Marcus Hook*, 430 F.3d at 444. Because that Upgrade was unnecessary at the time the first project, Mantua Creek, entered the queue, Mantua Creek was not assigned any cost responsibility for the Upgrade. *Marcus Hook*, 430 F.3d at 444. Marcus Hook and Liberty Electric bore it all, with 90% of the Upgrade's cost assigned to Marcus Hook. *See id.*; *see also* Rehearing Order at P 3. Both generators moved forward with the project, with Marcus Hook agreeing to pay "over $10 million of the upgrade's total cost." *Marcus Hook*, 430 F.3d at 444.

As the Upgrade neared completion, Mantua Creek unexpectedly cancelled its project and withdrew from the queue. *See* Rehearing Order at P 3. That decrease in the demand for power made the Upgrade unnecessary to support Marcus Hook's and Liberty Electric's projects. But PJM determined that completion of the almost-final Upgrade was the "least costly alternative," and thus "trudged forward and completed the upgrade." *Marcus Hook*, 430 F.3d at 444. The Upgrade was placed into service in June 2003.

Marcus Hook felt differently about being required to continue financing the Upgrade. Having paid over $9 million to PJM for improvements that were no longer necessary, Marcus Hook filed a complaint with the Commission seeking a refund. *Marcus Hook*, 430 F.3d at 444–445. The Commission rejected Marcus Hook's complaint. *See FPL Energy Marcus Hook, L.P. v. PJM Interconnection, L.L.C.*,

107 FERC ¶ 61,069 (2004) (*Marcus Hook I*), *reh'g denied*, 108 FERC ¶ 61,171 (2004) (*Marcus Hook II*). In 2005, this court upheld the Commission's decision in relevant part. *Marcus Hook*, 430 F.3d at 447–449.

**3.** The next year, petitioner West Deptford submitted an interconnection request to PJM. Rehearing Order at P 4. Under Section 37.7 of the PJM Tariff that was in effect on the date that West Deptford submitted its request (July 31, 2006), PJM could seek reimbursement for a previously constructed network upgrade from a new applicant for interconnection like West Deptford if the new proposed project (i) used the added capacity created by the upgrade or would have required the upgrade itself, (ii) the cost of the upgrade was at least $10 million, and (iii) the upgrade was "placed in service no more than five years prior to the affected Interconnection Customer's Interconnection Queue Closing Date." PJM Superseded Tariff § 37.7, J.A. 745.

Based on Section 37.7, PJM's first study of West Deptford's project proposed imposing financial responsibility for the Upgrade on West Deptford. *See* Rehearing Order at PP 5, 9; PJM Feasibility Study 8 (Nov. 2006), J.A. 580. West Deptford does not dispute that, if the 2006 Tariff controls its interconnection agreement, it must reimburse Marcus Hook and Liberty Electric for the costs of the Upgrade. Order at P 28.

Eighteen months later, while West Deptford's interconnection request was still pending, PJM filed several proposed amendments to its tariff. Rehearing Order at P 11; *see also Dominion*, 123 FERC ¶ 61,025 at PP 1–3 (settlement of administrative challenge to PJM Tariff resulted in proposed amendments). One proposed amendment significantly changed Section 37.7's assignment of financial responsibility

for prior upgrades. As relevant here, under Section 219 of the new 2008 tariff, PJM could seek reimbursement for previously constructed network upgrades only for a period of five years "from the execution date of the Interconnection Service Agreement for the project that initially necessitated the requirement for the Local Upgrade or Network Upgrade." PJM Tariff § 219(a), J.A. 762. While the tariff was silent about the effective date of that change, a transmittal letter from PJM noted that the next interconnection queue would begin on August 1, 2008, and then "request[ed] an August 1, 2008 effective date for these Tariff revisions." PJM Transmittal Letter 17, J.A. 711. Because Liberty Electric executed its interconnection agreement on May 14, 2001 and Marcus Hook executed its agreement on January 22, 2002, Rehearing Order at P 10, the Commission and PJM agree that, if the 2008 tariff controls, then that tariff's five-year time limit insulates West Deptford from having to pay for the Upgrade, Order at P 34.

Proceedings commenced before the Commission challenging aspects of the 2008 tariff, but West Deptford was not a party. In that proceeding, PJM received an inquiry asking whether the new cost-allocation provisions would "apply only to projects that enter the interconnection queue on or after the proposed effective date of August 1, 2008 or whether they will apply also to projects that have entered the queue before that date." Request for Clarification of American Municipal Power – Ohio, Inc. at 1, *Dominion Res. Servs., Inc. v. PJM Interconnection, L.L.C.*, Docket No. EL08-36-001 (FERC June 20, 2008). PJM responded that one revised provision of the tariff (known as Section 217.3a, J.A. 761, which governs upgrades costing less than $5 million and is not at issue here) "will become effective on August 1, 2008, and will be initially applied to the U2-Queue (this queue will close on July 31, 2008)." Answer of PJM

Interconnection, L.L.C. to Request for Clarification of American Municipal Power – Ohio, Inc. at 4, *Dominion Res. Servs., Inc. v. PJM Interconnection, L.L.C.,* Docket No. EL08-36-001 (FERC July 7, 2008), J.A. 555. With respect to Section 219(a), J.A. 762, the provision at issue here, PJM separately stated that "[t]hese modifications are intended to be effective as of August 1, 2008, and will be initially applied to the U2-Queue." *Id.*

On August 19, 2008, the Commission accepted PJM's revised tariff, but referenced only PJM's clarification of the effective date for the provision not relevant here, stating that Section 217.3a "will be applied to the U2-Queue effective August 1, 2008." FERC Letter Order at 1, *Dominion Res. Servs., Inc. v. PJM Interconnection, L.L.C.*, Docket No. EL08-36-001 (August 19, 2008), J.A. 742. The Commission did not mention PJM's clarification of the effective date for the provision at issue in this case, Section 219(a). *See id.*

Over the next three years, PJM conducted two more studies of West Deptford's interconnection request. In both of them, PJM expressed its intention to charge West Deptford the full $10 million for the Upgrade, as had been permitted by the superseded tariff. PJM System Impact Study Report 4–5 (September 2010), J.A. 594–595; PJM Facilities Study Report 4, 10 (April 2011), J.A. 612, 618. West Deptford claims, Reply Br. 25, and no one disputes, that it repeatedly objected to this attempted cost allocation.

## *PROCEDURAL HISTORY*

In 2011, PJM provided West Deptford a draft interconnection service agreement that imposed the full cost of the Upgrade on West Deptford. West Deptford Protest at 9, J.A. 434. West Deptford objected, *id.*, and PJM filed the unexecuted agreement with the Commission, seeking its

resolution of the dispute. Rehearing Order at P 6. West Deptford argued that imposing the superseded tariff's terms for cost allocation violated both the filed rate doctrine and past Commission precedent enforcing the terms of tariffs that were in effect when an interconnection agreement was executed or filed, rather than when a prospective customer entered the queue. West Deptford Protest at 15, J.A. 440. West Deptford also argued, as relevant here, that even if it were required to reimburse Marcus Hook and Liberty Electric for the Upgrade, its cost should be offset by the value of the auction revenue rights that Marcus Hook and Liberty Electric had already received and exercised as a result of having previously paid for the Upgrade's construction. *Id.* at 26–27, J.A. 451–452.

The Commission rejected West Deptford's protest. Acknowledging that West Deptford could not be liable for the Upgrade under the on-file tariff, the Commission nonetheless concluded that the cost-allocation provisions of the superseded tariff should govern "since, at the time when West Deptford entered the PJM interconnection queue, that provision was the one that established its financial responsibility." Order at P 35. According to the Commission, that fact put West Deptford "on notice of the costs to which it potentially would be liable." *Id.* at P 38.

With respect to West Deptford's separate claim for auction revenue rights, the Commission ruled that the issue was not ripe. Order at P 43. In so ruling, the Commission relied this time on the on-file 2008 Tariff, and noted that it provided that the surrender of auction revenue rights applies only once the "New Service Customer * * * executes * * * an Interconnection Service Agreement," which West Deptford has not yet done. *Id.* at P 43 (quoting PJM Tariff § 231.4(1)(b), J.A. 767; omissions in original).

West Deptford requested rehearing, which the Commission denied. The Commission said that PJM could enforce the superseded tariff's cost-allocation rule because, during the tariff-revision proceedings to which West Deptford was not a party, PJM had clarified that the new tariff's cost-allocation provision (Section 219) would only apply starting with projects in the "U2 Queue," which closed in the Summer of 2008. Rehearing Order at P 31. The Commission also reasoned that each of PJM's interconnection studies had provided West Deptford notice of PJM's intent to enforce the superseded tariff's cost-allocation provision. *Id.* at P 28. With respect to past Commission precedent, the Commission stated that its decisions did not bind it to "a single policy to address all of the myriad issues that may arise from a change to cost allocation in the interconnection process." *Id.* at P 38. Finally, the Commission restated, without additional explanation, its conclusion that West Deptford's auction-revenue-rights claim would be unripe until after it executed the interconnection agreement. *Id.* at P 59.

West Deptford timely petitioned for review, and PJM and Marcus Hook intervened.

## II

### *STANDARD OF REVIEW*

We have jurisdiction under 16 U.S.C. § 825*l*(b). We review Commission orders under the arbitrary and capricious standard, and will uphold the Commission's factual findings if they are supported by substantial evidence. *See* 5 U.S.C. § 706(2); *see also, e.g.*, *Sacramento Municipal Util. Dist. v. FERC*, 616 F.3d 520, 528 (D.C. Cir. 2010). Under that familiar standard, we must determine whether the Commission's orders "examined the relevant data and articulated a rational connection between the facts found and

the choice made." *Alcoa Inc. v. FERC*, 564 F.3d 1342, 1347 (D.C. Cir. 2009) (internal punctuation and citation omitted). While we defer to the Commission's interpretation of its own precedent, *see NSTAR*, 481 F.3d at 799, the Commission cannot depart from those rulings without "'provid[ing] a reasoned analysis indicating that prior policies and standards are being deliberately changed, not casually ignored.'" *Alcoa*, 564 F.3d at 1347 (quoting *Entergy Servs., Inc. v. FERC*, 319 F.3d 536, 541 (D.C. Cir. 2003)). Those same principles also govern our review of the Commission's application of the filed rate doctrine. *See NSTAR*, 481 F.3d at 800. Our review of the Commission's interpretation of filed tariffs is "*Chevron*-like in nature," which means that we give "substantial deference" to the Commission's interpretation unless "the tariff language is unambiguous." *Old Dominion Elec. Co-Op., Inc. v. FERC*, 518 F.3d 43, 48 (D.C. Cir. 2008) (internal quotation marks omitted).

# III

## *ANALYSIS*

As in many Federal Energy Regulatory Commission cases, aspects of this case seem complex. But the legal principles that dictate our decision are relatively straightforward. The Commission held that the amount of money West Deptford would have to pay to obtain transmission services would be dictated by a tariff provision that had been superseded more than three years before PJM even proposed a contract. To sustain that determination, the Commission was obligated to provide a reasoned explanation of how applying that charge comported with the text of the Federal Power Act and prior Commission precedent. The Commission's decision did neither. Nor did the Commission's ripeness analysis adequately address West

Deptford's claims concerning already-exercised auction revenue rights. We accordingly vacate the orders in part and remand the case to the Commission for further proceedings consistent with this decision.

### A. THE COMMISSION'S APPLICATION OF THE SUPERSEDED TARIFF WAS NOT ADEQUATELY REASONED

**1.** The Commission's decision, first and foremost, must conform to statutory direction. And the Federal Power Act is quite clear: "*All* rates and charges made, demanded, or received by any public utility for or in connection with the transmission or sale of electric energy" subject to the Commission's jurisdiction must be "file[d] with the Commission," "open in convenient form," and available for "public inspection." 16 U.S.C. § 824d(a) & (c) (emphasis added). Furthermore, if a utility makes any changes to a filed "rate, charge, classification, or service," its public filing with the Commission must "stat[e] *plainly*" both the changes made to the tariff "then in force," and "the time when the change or changes will go into effect." *Id.* § 824d(d) (emphasis added).

PJM's 2008 tariff did not identify any effective date for its changed cost-allocation provision, let alone do so "plainly." In particular, nothing in the tariff explained when the cost-allocation rules would transition from those previously in force (which would have obligated West Deptford to pay for the Upgrade) to those in the 2008 tariff (which would not charge West Deptford for the Upgrade). Right out of the box, then, the Commission's application of the superseded tariff, rather than the new one, ran into statutory headwinds that the Commission needed to address.

**2.** As the Commission noted, Order at P 37, a transmittal letter accompanying the new tariff did request an

"August 1, 2008 effective date for these Tariff revisions," J.A. 711. The Commission's decision seems to assume, and West Deptford does not disagree, that the transmittal letter satisfied the Act's legal requirements that the notice of the change's effective date be "fil[ed] with the Commission" and be "open for public inspection," 16 U.S.C. § 824d(d), and so we assume for purposes of decision that it does (although it would have been far better for the Commission to explain its thinking).

The dispute in this case centers, instead, on whether the Commission's application of the transmittal letter's request for an August 1, 2008 effective date in this case "plainly" stated that the effective date would be August 1, 2008 only for those generators in the U2 queue, and not for those generators in earlier queues who signed interconnection agreements after the August 1st effective date. The Commission failed to adequately explain how it found the statutory requirements satisfied in this case.

To start with, the letter, by its plain terms, does not contain the limitation on who gets the August 1, 2008 effective date that the Commission enforced. At best, the request for "an August 1, 2008 effective date for these Tariff revisions," J.A. 711, is silent about whether the date of the interconnection agreement or of entry into the queue had to fall on or after August 1st. And, at worst, given the Federal Power Act's textual application of filed rates to "any transmission or sale," 16 U.S.C. § 824d(c), the letter implies that, beginning August 1st, all charges for transmission and sales contracts, including interconnection service, would hew to the new tariff's terms.

PJM's letter transmitting the new tariff to the Commission did introduce its proposed effective date by

noting that it requested August 1, 2008, "[b]ecause the next interconnection queue will begin on August 1, 2008." J.A. 711. But that introductory clause, which is crafted in explanatory rather than operative language, simply adds to the confusion about what must be in place by August 1st.

Furthermore, the Commission never endorsed that prefatory language as part of the effective date when it accepted PJM's tariff revisions, *see* J.A. 742, and it has failed to provide any explanation of whether and how the bare mention of the next queue date, without endorsement by the Commission at the time of acceptance, could have legally operative force for purposes of the filed rate doctrine. Indeed, the Commission has yet to explain, in this ruling or any other of which we are aware, what the legal status of information in a transmittal letter is—and what the impact of Commission endorsement is—for purposes of compliance with the Federal Power Act's filed rate requirements.

**3.** A further barrier to affirming the Commission's decision is that it appears to contradict Commission precedent applying the tariff in effect on the date of execution of an interconnection agreement or the agreement's filing with the Commission, and not the date a generator entered the queue. For example, in *Midwest Independent Transmission System Operator, Inc. (MISO III)*, 125 FERC ¶ 61,277 P 10 (2008), Midwest filed an amended tariff that took effect in August 2008. When Midwest filed two interconnection agreements the next month, however, it sought—just as PJM does here—to apply the superseded tariff that was in effect when its customers entered the queue, rather than the updated tariff. *Id.* at P 5. The Commission flatly rejected that effort. *Id.* at P 10. In sharp contrast to its decision in this case, the Commission ruled that Midwest could not apply the old tariff

to agreements executed after the amended tariff took effect. *Id.*

The Commission reaffirmed that position two years later in another Midwest case. Describing its previous holding in *MISO III*, the Commission explained that, "because two generator interconnection agreements had been executed after the effective date of newly revised interconnection queue rules, the interconnection agreements [had to] be revised to conform with the new rules," rather than the rules in place at the time the generators entered the queue. *Midwest Indep. Transmission Sys. Operator, Inc. (MISO IV)*, 129 FERC ¶ 61,060 P 62 n.120 (2009). The Commission then held that, as in *MISO III*, it had to apply the tariff "effective and on file on the date that the interconnection agreement is executed or filed unexecuted." *MISO IV*, 129 FERC ¶ 61,060 at P 62; *see also Midwest Indep. Transmission Sys. Operator, Inc. (MISO I)*, 114 FERC ¶ 61,106 P 70 (2006) (interconnection agreement would be governed by the presently effective tariff, rather than the tariff in effect when the agreement was being negotiated); *Midwest Indep. Transmission Sys. Operator, Inc. (MISO V)*, 131 FERC ¶ 61,165 P 32 (2010) (although cost-allocation methodology in tariff changed while interconnection agreement was being negotiated, "the cost allocation methodology that was effective and on file" on the date the agreement was executed or filed with the Commission controlled); *Midwest Indep. Transmission Sys. Operator, Inc. (MISO VI)*, 138 FERC ¶ 61,199 P 42 (2012) (declining to apply deadlines in an amended tariff because the interconnection agreement was governed by "the tariff effective and on file at the time the [agreement] was filed with the Commission and proposed to take effect"); *MidAmerican Energy Co.*, 116 FERC ¶ 61,018 P 13 (2006) (following practice of "review[ing] interconnection agreements based on

the terms and conditions in effect on the date when they are filed").

Indeed, until now, there appeared to be an unbroken Commission practice of holding that interconnection agreements filed after the designated effective date of an amended tariff are governed by the amended tariff, unless the amended tariff has a grandfathering provision. *See Edison Mission Energy v. Midwest Indep. Transmission Sys. Operator, Inc.*, 136 FERC ¶ 61,035 PP 38–40 (2011) (applying grandfathering provision in tariff that divided interconnection requests into four categories based on their status when tariff revisions took effect); *Arizona Public Serv. Co.*, 137 FERC ¶ 61,099 P 25 (2011) (accepting proposed tariff revision "grandfather[ing] existing interconnection requests for" customers that had reached a certain milestone in the interconnection process).

It is textbook administrative law that an agency must "provide[] a reasoned explanation for departing from precedent or treating similar situations differently," *ANR Pipeline Co v. FERC*, 71 F.3d 897, 901 (D.C. Cir. 1995), and Commission cases are no exception, *see Colorado Interstate Gas Co. v. FERC*, 146 F.3d 889, 893 (D.C. Cir. 1998) ("Because it has not adequately explained its decision to treat [entities] differently in a context where they appear similarly situated, we remand the case to the Commission for a fuller explanation."). The Commission, however, failed to provide a reasoned explanation for why West Deptford's interconnection agreement should be treated any differently than those in predecessor decisions. Accordingly, the Commission's deviation from that precedent is not "justified either as consistent with precedent or as a considered departure therefrom." *Williams Gas Processing-Gulf Coast Co. v. FERC*, 475 F.3d 319, 327 (D.C. Cir. 2006).

**4.** With a paean to administrative flexibility, the Commission argues that it can employ a case-by-case approach to deciding whether entry into the queue or, instead, the execution or filing of an interconnection agreement is the relevant trigger for an effective date. Perhaps. But the Commission must first provide a reasoned decision explicating how such case-by-case variation, absent explicit tariff provisions publicly identifying different effective dates for customers, jibes with the Federal Power Act's unqualified directive that "the time when the change or changes" in an amended tariff will displace the schedules "then in force" and "go into effect" must be "plainly" stated in an open, accessible, and convenient manner, 16 U.S.C. § 824d(d). In addition, the Commission would have to explain how such a case-by-case approach would protect against the discrimination and unpredictability in rates and charges that Section 824d proscribes. *See NSTAR*, 481 F.3d at 800.

That is just the beginning. The Commission would also need to elucidate how such case-by-case variation would fit with the Federal Power Act's purposes given that it has previously decided that those aims are best served by imposing increased uniformity in tariff terms in lieu of conducting case-by-case adjudications. *See* Order No. 2003, FERC Stats. & Regs. ¶ 31,146 at P 11. Generally, such standardization "ensures that interconnection customers * * * receive non-discriminatory service and that all interconnection customers are treated on a consistent and fair basis." *MidAmerican Energy*, 116 FERC ¶ 61,018 at P 7.

And finally, the Commission would have to provide a reasoned analysis, resting on articulated objective, non-discriminatory, and evenhanded criteria, that would justify treating West Deptford differently than the generators in all those other cases in which the Commission enforced the tariff

in effect at the time an agreement was filed or executed. *See Muwekma Ohlone Tribe v. Salazar*, 708 F.3d 209, 216 (D.C. Cir. 2013) ("Agency action is arbitrary and capricious if 'the agency offers insufficient reasons for treating similar situations differently.'") (quoting *County of Los Angeles v. Shalala*, 192 F.3d 1005, 1022 (D.C. Cir. 1999)).  That is because identifying the relevant factors that would govern a case-by-case analysis is critical to ensuring that the Federal Power Act's requirements of openness, equal treatment, and predictability in rates are enforced.

The Commission's decision in this case did none of those things.  The Commission instead pointed to yet another *Midwest* decision as purportedly evidencing its case-by-case approach.  *See* Rehearing Order at P 40 (citing *Midwest Indep. Transmission Sys. Operator, Inc. (MISO II)*, 124 FERC ¶ 61,183 P 90 (2008), *order on reh'g*, 127 FERC ¶ 61,294).  But *MISO II* makes things worse not better for the Commission's position.  In that case, the Commission permitted Midwest to apply interconnection procedures from its old tariff to certain customers already waiting in the queue.  *MISO II*, 124 FERC ¶ 61,183 at PP 1, 84–90.  But the Commission did so because the text of the revised tariff itself provided for that differential treatment.  *See* Proposed Revisions to Open Access Transmission and Energy Markets Tariff part 2, § 5.1.2, *Midwest Indep. Sys. Operator, Inc.*, Docket No. ER08-1169 (FERC June 26, 2008).  In other words, all that *MISO II* establishes is that the Commission may approve a *tariff* the express terms of which differentiate when its terms will take effect and when they will not.  That does nothing to justify what appears to be the Commission's one-off decision in this case to *deviate* both from the filed tariff and from precedent consistently enforcing the tariff on file on the date an agreement is filed or executed, even though

the on-file tariff contained no grandfather clause or any other indication of its variable application.

Compounding the problem for the Commission is its reliance on *FPL Energy Marcus Hook, L.P. v. PJM Interconnection, L.L.C.* (*Marcus Hook III*), 118 FERC ¶ 61,169 (2008). Critically, that case involved not just the PJM system, but the very network upgrade for which cost allocation is at issue in this case. *Id.* at P 2. The Commission in this case read *Marcus Hook III* as establishing that the time a generator enters the queue could be the relevant point at which costs are determined, given how long the interconnection process can take and the need to account for business risks at the outset. Order at P 36 & n.29; Rehearing Order at P 36. But in so stating, the Commission coyly cited a footnote in *Marcus Hook III*, and described it as applying the "tariff on file 'when the interconnection *was being considered*.'" Order at P 36 n.29 (quoting *Marcus Hook III*, 118 FERC ¶ 61,169 at P 11 n.9) (emphasis added); Rehearing Order at P 36 (quoting same footnote). So fortified, the Commission then assured that "[s]imilarly, the tariff we apply here is the one on file when West Deptford's interconnection request *was being considered*." Rehearing Order at P 36 (emphasis added).

The Commission would have done better to look above the footnote to what it actually ruled in *Marcus Hook III*, because there is nothing at all "similar[]" about the two outcomes. Quite the opposite, as counsel for the Commission conceded at oral argument, Oral Arg. Tr. 44:18-20, *Marcus Hook III* applied not the tariff in effect at the time the interconnection customer entered the queue, but "*the PJM tariff in effect at the time the Interconnection Service Agreement was executed*[.]" 118 FERC ¶ 61,169 at P 10 (emphasis added); *see also FPL Energy Marcus Hook, L.P. v.*

*PJM Interconnection, L.L.C. (Marcus Hook IV)*, 123 FERC ¶ 61,289 P 6 n.6 (2008) (reconfirming, on denial of rehearing, that PJM's 2001 tariff, which was "in force at the time of execution of the [interconnection service agreement]," controlled); *see also id.* at P 80 (tariff provision in effect "at the time that the [interconnection service agreement] was executed" "properly governs the relationship between the parties").

In other words, the last time the Commission addressed for this very same tariff the question of which event the effective date turned on—the queue entry date or the interconnection agreement date—the Commission gave the exact opposite answer.  That is the very essence of unreasoned and arbitrary decisionmaking:  "[G]loss[ing] over or swerv[ing] from prior precedents without discussion * * * cross[es] the line from the tolerably terse to the intolerably mute."  *Bush-Quayle '92 Primary Committee, Inc. v. FEC*, 104 F.3d 448, 453 (D.C. Cir. 1997) (internal quotation marks omitted).

**5.**  The Commission also invoked the so-called notice exception to the filed rate doctrine.  We have said that the "filed rate doctrine simply does not extend to cases in which buyers are on adequate notice that resolution of some specific issue may cause a later adjustment to the rate being collected at the time of service."  *Natural Gas Clearinghouse v. FERC*, 965 F.2d 1066, 1075 (D.C. Cir. 1992).  Unfortunately, "[o]ur decisions on the necessary notice have not been altogether clear."  *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 577 (D.C. Cir. 1990).  For the most part, however, the notice exception has been confined to two scenarios.

First, it permits the filing of tariffs that provide a formula for calculating rates, rather than a specific rate number.  This

court had held that such a "formula itself is the filed rate that provides sufficient notice to ratepayers" to comport with the Federal Power Act's open-filing requirements, and that the objectivity of formulae ensures evenhandedness, predictability and stability in rates. *Public Utils. Comm'n v. FERC*, 254 F.3d 250, 254 n.3 (D.C. Cir. 2001); *see also Transwestern Pipeline*, 897 F.2d at 578 ("The Commission need not confine rates to specific, absolute numbers but may approve a tariff containing a rate 'formula' or a rate 'rule' * * *; it may not, however, simply announce some formula and *later* reveal that the formula was to govern from the date of announcement[.]"); *see also id.* ("[W]e think that where the Commission *explicitly* adopts a formula and indicates *when it will take effect*, courts may not * * * say that such a formula may never qualify as a 'rate[.]'") (emphasis added); *NSTAR*, 481 F.3d at 801 (confirming the "acceptability of tariffs with a rate formula" under the filed rate doctrine).

Second, the notice exception has been applied when judicial invalidation of Commission decisions has resulted in retroactive changes in rates. *Canadian Ass'n of Petroleum Producers v. FERC*, 254 F.3d 289, 299–300 (D.C. Cir. 2001); *Western Resources, Inc. v. FERC*, 72 F.3d 147, 151 (D.C. Cir. 1995); *Public Utils. Comm'n v. FERC*, 988 F.2d 154, 163–166 (D.C. Cir. 1993); *Natural Gas Clearinghouse*, 965 F.2d at 1075–1077. The Commission has reasoned, and this court has agreed, that generators in those cases were aware in advance of the risk of litigation-induced change and, more importantly, "[w]ere the Commission not able to take remedial action to correct its errors, '[ratepayers] would be substantially and irreparably injured by Commission errors, and judicial review would be powerless to protect them from many of the losses so incurred.'" *See Western Resources*, 72

F.3d at 151 (quoting *Natural Gas Clearinghouse*, 965 F.2d at 1074–1075) (internal brackets omitted).[1]

This case presented neither of those well-established situations. Instead, the Commission pointed (Order at P 26) to PJM's statement in a pleading during the tariff-revision process that the revisions to the cost-allocation provision "are intended to be effective as of August 1, 2008, and will be initially applied to the U2-queue." J.A. 555. The Commission's decision, however, failed to provide any reasoned explanation of how such language in a non-binding pleading in litigation to which West Deptford was not even a party could provide the type of fair notice the Federal Power Act and precedent require.

To begin with, as the Commission's counsel acknowledged at oral argument, PJM's supposedly clarifying statement was actually "confusing" as to the effective date. Oral Arg. Tr. 49:8. While the pleading said that amended Section 219(a) would "be effective as of August 1, 2008, and will be initially applied to the U2-Queue," just a few sentences earlier PJM said that the "U2-Queue * * * will close on July 31, 2008." Answer of PJM Interconnection, L.L.C. to Request for Clarification of American Municipal Power – Ohio, Inc. at 4, *Dominion Res. Servs., Inc. v. PJM Interconnection, L.L.C.,* Docket No. EL08-36-001 (FERC July 7, 2008), J.A. 555. The first statement suggests prospectivity; the latter applies Section 219 backward to some unidentified date (apparently, sometime in May 2008) at which the U2 queue started.[2] Applying the new provision to

---

[1] Parties may also mutually agree to give a new rate retroactive effect. *See Consolidated Edison*, 347 F.3d at 969.

[2] *See* PJM INTERCONNECTION, L.L.C., *Generation Queues: Active*, http://www.pjm.com/planning/generation-interconnection/ generation-queue-active.aspx (follow "U2" hyperlink) (last visited

customers who started the process in *May* ill fits the concept of an *August* effective date. More to the point, that contradiction undermines the Commission's insistence that it accepted PJM's tariff with only "prospective" effect, Rehearing Order at P 29, and "appl[ied] the tariff change at issue only to future queue participants," *id.* at P 42.

Beyond that, charging customers with notice of every statement in every pleading submitted in proceedings to which they are not even parties is a far logical leap from the discrete categories to which the notice exception has generally been limited. The Commission cited no prior application of the notice exception that stretched this far. The Commission also failed to explain how that material expansion of the notice exception remains consistent with the express commands of the Federal Power Act and the filed rate doctrine, or how an exception so broadly construed could avoid consuming the rule that rates are supposed to identify new changes "plainly," and do so in filed tariffs that are "open in convenient form and place for public inspection." 16 U.S.C. § 824d(c) & (d). Perhaps it can do that, but the decision on review provides no trace of a reasoned decision in that regard.

Finally, the Commission indicated that the studies PJM undertook while West Deptford was in the queue provided ample notice because each assigned West Deptford financial responsibility for the Upgrade. The problem with that argument is threefold. First, it overlooks that West Deptford repeatedly objected throughout that time period to any such imposition of cost responsibility as impermissible.

August 3, 2008) (listing projects entering the U2 queue from May 16, 2008 through July 31, 2008).

Second, as with the pleading, the Commission provides no reasoned explanation for expanding the notice exception to encompass such one-way assertions, especially since generators have no apparent way to challenge any costs such studies purport to assign at that stage in the interconnection process.

Third, the Commission's position paid no heed to prior Commission precedent that treated such studies as just a "non-binding estimate of costs." *Dominion*, 123 FERC ¶ 61,025 at P 52.

In sum, because the Commission failed, at multiple steps, to provide any reasoned explanation of how its decision conformed to the Federal Power Act and prior precedent, we must remand for the Commission "to explain why its decision in this case is not inconsistent with [past precedent] or, alternatively, to justify its apparent departures." *Brusco Tug & Barge Co. v. NLRB*, 247 F.3d 273, 278 (D.C. Cir. 2001); *see also Northeast Energy Associates v. FERC*, 158 F.3d 150, 156 (D.C. Cir. 1998).

### B. The Commission Failed to Address the Impact of Already Exercised Auction Revenue Rights on West Deptford's Cost

Before the Commission, West Deptford made two distinct arguments regarding auction revenue rights should the 2006 Tariff apply. First, West Deptford argued that PJM could not force West Deptford to pay for the Upgrade until Marcus Hook and Liberty Electric surrendered any unexercised auction revenue rights they still had. Second, West Deptford contended that its $10 million charge should be offset by the amount of compensation for building the Upgrade that Marcus Hook and Liberty Electric had already received from auction revenue rights they had previously

exercised.  West Deptford Protest at 25–27, J.A. 450–452; West Deptford Request for Rehearing at 24–26, J.A. 665–667.

Addressing only the first argument, the Commission construed the 2008 PJM Tariff to require transfer of unexercised auction rights only after West Deptford executed "'an Interconnection Service Agreement.'"  Order at P 43 (quoting PJM Tariff § 231.4(1)).  Because West Deptford "ha[d] not yet executed its" agreement, the Commission ruled that West Deptford's claim was "not yet ripe."  *Id.*  In denying rehearing, the Commission reiterated that, once West Deptford executes the interconnection service agreement, its claim to auction revenue rights "will be perfected and PJM will be required to assign those [rights] as provided in its tariff."  Rehearing Order at P 59.

While the Commission's decision about the transfer of auction rights yet to be exercised was reasonable as far as it went, it did not go far enough.  The ripeness rationale does not work for West Deptford's separate argument that the $10 million price tag should have been offset by the amount of the cost that Marcus Hook and Liberty Electric had already recovered through exercising auction revenue rights.  Put differently, West Deptford asked the Commission for a price check on the Upgrade.  There was nothing unripe about that.  To the extent that Marcus Hook and Liberty Electric already recouped their payments from those auction revenue rights, they would have been paid a second time when West Deptford handed over its $10 million. Oral Arg. Tr. 38:19-20. West Deptford thus is presently out of pocket any such overpayment.

The Commission's counsel posited at oral argument that the issue remained unripe because, under the PJM Tariff, Marcus Hook or Liberty Electric could choose not to

relinquish *any* auction rights. Oral Arg. Tr. 68:13-21. But if that happened, it would appear to reduce West Deptford's financial responsibility to zero, and disentitle Marcus Hook and Liberty Electric to their respective shares of the $10 million already paid over by West Deptford. *See* PJM Tariff § 231.4(d)(2), J.A. 767. Why Marcus Hook and Liberty Electric are allowed to keep both the funds already received from exercised auction rights and the $10 million is left entirely unexplained by the Commission.

In any event, we need not—and indeed cannot—consider "appellate counsel's *post hoc* rationalizations" for Commission action. *Maine Public Utils. Comm'n v. FERC*, 625 F.3d 754, 759 (D.C. Cir. 2010) (internal quotation marks omitted). The Commission's failure to explain why the retrospective offsets could not be calculated, and our inability to "discern a reasoned path" to that conclusion, *Marcus Hook*, 430 F.3d at 449, require us to remand for further explanation.

**IV**

*CONCLUSION*

Because the Commission failed to provide an adequate explanation either for its decision to apply the superseded tariff to an interconnection agreement filed after the new tariff's effective date, or for its refusal to address the auction revenue rights offset, we grant West Deptford's petition for review, vacate the Commission's orders in relevant part, and remand to the Commission for additional explanation consistent with the decision of this court.

*So ordered.*